# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

DONMONIQUE COCKRUM,

      Petitioner,

v.                                    Case No. 3:19-cv-786-TJC-JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

---

## ORDER

## I.   Status

Petitioner, an inmate of the Florida penal system, is proceeding on a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Doc. 1). He challenges a state court (Duval County, Florida) judgment of conviction for attempted second degree murder. He is serving a thirty-year prison sentence. Respondents filed a Response (Doc. 10) with exhibits (Docs. 10-1 to 10-3; "Resp. Ex."). Petitioner filed a Notice indicating he would not file a reply (Doc. 12). This case is ripe for review.[1]

---

[1] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must

## II.     <u>Governing Legal Principles</u>

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

---

consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is not necessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 562 U.S. at 101 (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope

v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal citations modified).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state

5

> procedural rule. See, e.g., Coleman, 501 U.S. at 747-48; Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 131 S. Ct. 1120, 1127-28 (2011); Beard v. Kindler, 130 S. Ct. 612, 617-18 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S. at 750.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012) (internal citations modified). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986). Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999) (internal citations modified).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such

evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). Courts employ a two-part test when reviewing ineffective assistance of counsel claims. See Strickland, 466 U.S. at 687.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant

> of a fair trial, a trial whose result is reliable." Id. at
> 687.

Richter, 562 U.S. at 104 (internal citations modified).[2]

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation; thus, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is afforded great deference.

> "[T]he standard for judging counsel's representation is
> a most deferential one." Richter, 562 U.S. at 105. But
> "[e]stablishing that a state court's application of

---

[2] This two-part Strickland standard also governs a claim of ineffective assistance of appellate counsel. Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016). "Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. (internal quotations and citations omitted). To satisfy the prejudice prong, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004); see also Philmore v. McNeil, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal").

> <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014) (internal citations modified). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference--this one to a state court's decision--when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## III.  <u>Analysis</u>

To place the issues in context, the Court provides a brief summary of the pertinent trial testimony. The victim, Kelley Williams, testified that he grew up with Petitioner, and Williams did not want to testify against Petitioner because Petitioner was like a brother to him. Resp. Ex. B at 39, 72. Williams testified

that Petitioner and Sharmiya Middleton had a child together, but at the time of the shooting (October 5, 2009), Williams was in a relationship with Middleton. Id. at 41-42. Williams stated that on October 5, 2009, he was on the porch of Middleton's apartment with Middleton and Petitioner. See id. at 44-46. Middleton and Petitioner began arguing over finances, and Petitioner started choking Middleton. See id. at 46-47. Williams then put Petitioner in a headlock and told Petitioner to let go of Middleton because Middleton was pregnant with Williams' baby. See id. at 47-49. Petitioner let go of Middleton and said, "we're going to finish this later," and he left. Id. at 49.

Williams then went back to his house and about 30 minutes after the confrontation with Petitioner, Williams was outside on the porch smoking a marijuana cigarette when he saw three individuals riding bicycles toward his house. Id. at 51-52, 54. Williams testified that one of the individuals on a bicycle was Petitioner. Id. at 53. Williams stated that Petitioner "hopped off the handlebars" of his bike, and another individual handed Petitioner a gun. Id. at 54. Williams stood up, and when Petitioner raised the gun toward Williams, Williams ran inside the house. Id. at 54-55, 86. While going inside, Williams "heard like three shots" and "glass falling." Id. at 56. Williams stayed inside for about ten seconds and when he exited his house, he saw Petitioner and the two other individuals riding off. Id. 57-58. After the shooting, but before the police arrived, Petitioner called Williams' cell phone and asked Williams why he called

the police. Id. at 59. Williams told Petitioner that he did not call the police but his mother did. Id. On cross-examination, Williams testified that he had gotten up from the chair on the porch and entered the house before Petitioner began shooting; thus, he did not actually see Petitioner pull the trigger. Id. at 84.

Quillian Addison, one of Williams' neighbors, also testified. Id. at 93. According to Addison, on October 5, 2009, he walked into his yard and saw three black males who he did not recognize riding bicycles in circles on his dead-end street. Id. at 95, 97. One of the individuals got off the bicycle, retrieved something from one of the other individuals, and then walked to the edge of the sidewalk and started shooting at Williams' house. Id. at 95-96, 98. Addison described the shooter as a short black male with a light skinned complexion. Id. at 97-98. A few minutes after the shooting, Addison spoke to Williams, and Williams identified the shooter as Petitioner. Id. at 99-100.

Officer Isaiah Fields with the Jacksonville Sheriff's Office testified that in response to a domestic violence report, he was dispatched to Middleton's apartment on October 5, 2009. Id. at 108-09. Officer Fields observed redness around Middleton's neck and a bite mark on her. Id. at 110. Based on the information Middleton provided, Officer Fields attempted to make contact with Petitioner. Id. at 111. Officer Fields was then dispatched to Williams' house in regard to the shooting, where he observed "that the house had been shot by a small-caliber bullet . . . [that] went through the window and finally lodged into

an interior room's wall." Id. at 111-12, 113. After speaking with Williams, Officer Fields confirmed that the domestic violence situation at Middleton's apartment was related to the shooting at Williams' home. Id. at 114. Officer Fields also testified that Williams identified Petitioner as the shooter. Id. at 114-15.

Detective Tracy Stapp testified that he searched the scene and found one shell casing and located five bullet strikes in the home. Id. at 130, 134. He testified that the strikes were around the window, and he was able to locate the "corresponding holes along the back wall [of the house] opposite of the window." Id. at 136. He confirmed that the evidence showed someone shot at the house multiple times. Id. at 138-39.

After the state rested its case, Petitioner testified on his own behalf. He stated that on October 5, 2009, Middleton called him and invited him to her apartment to see the children. Id. at 161. At some point, Middleton hit Petitioner "out of the blue," id. at 163, which caused Petitioner to drop his son, id. at 164. Middleton continued to "throw[] the punches" and "[t]hat's when [Petitioner] had to grab her, and then [they] started tussling." Id. At that point, "some black dude who had long twists in his hair . . . stepped up" and hit Petitioner with a gun. Id. Petitioner confirmed that he was friends with Williams, but denied that Williams was present at Middleton's apartment that

day. Id. at 165. Petitioner then left and went to his grandma's house. Id. at 166. Petitioner explicitly denied shooting at Williams' home. Id. at 169.

### A. Ground One

Petitioner argues that his appellate counsel was ineffective for failing to raise on direct appeal the trial court's error in denying Petitioner's motion for judgment of acquittal. Doc. 1 at 5. According to Petitioner, he is "actually innocent of the charge of attempted second degree murder" and the evidence at trial showed "at best, [he] is only guilty of shooting into an occupied dwelling." Id.

Petitioner raised this claim in his state court habeas petition alleging ineffective assistance of appellate counsel. Resp. Ex. L. The First District Court of Appeal per curiam denied the petition on the merits. Resp. Ex. M.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The record supports the state court's decision. Considering the evidence presented by the state, the trial court properly denied Petitioner's motion for judgment of acquittal. Thus, appellate counsel cannot be deemed ineffective for failing to raise that issue on direct appeal. See Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1145 (11th Cir. 2005) ("[N]onmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel."). As such, the Court concludes that the state court's adjudication of this claim was not

14

contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.[3]

## B. Ground Two

Petitioner contends that his appellate counsel was ineffective for failing to raise on direct appeal the issue of prosecutorial misconduct during the state's closing argument. Doc. 1 at 7. Petitioner claims that during the state's closing argument, the prosecutor improperly stated numerous times that the witness (Addison) and victim (Williams) testified that Petitioner shot at Williams. However, according to Petitioner, neither the witness nor the victim testified that Petitioner shot at the victim but instead, they testified that he shot at the victim's home.

---

[3] Insofar as Petitioner attempts to raise a freestanding actual innocence claim, he is not entitled to any relief. Eleventh Circuit "precedent forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction absent an independent constitutional violation occurring in the underlying state criminal proceeding." Raulerson v. Warden, 928 F.3d 987, 1004 (11th Cir. 2019) (internal quotations and citation omitted); see also Cunningham v. Dist. Attorney's Off. for Escambia Cnty., 592 F.3d 1237, 1272 (11th Cir. 2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases"); Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007) ("[O]ur precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non-capital cases."). Additionally, Petitioner's "actual innocence" argument is simply a disagreement with the jury's verdict. But "[f]ederal courts are not forums in which to relitigate state trials." Herrera v. Collins, 506 U.S. 390, 401 (1993).

Petitioner raised this claim in his state court habeas petition alleging ineffective assistance of appellate counsel. Resp. Ex. L. The First District Court of Appeal per curiam denied the petition on the merits. Resp. Ex. M.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The record supports the state court's decision. During Williams' testimony, both sides focused on exactly where Williams was when the shots were being fired. During his direct examination by the state, the following exchange occurred:

> Q   When he raised the firearm up at you, did you stand there?
>
> A   No.
>
> Q   Okay. Where did you run to?
>
> A   In the house.
>
> Q   And as you were running in the house, did you hear anything?
>
> A   Yes. I heard like three shots, and I heard glass falling. Then I looked around and seen everyone ducking. My mom was yelling like, What is going on, what is going on?

Resp. Ex. B at 56. On cross-examination, Petitioner's counsel inquired of Williams:

> Q   Would you agree, however, that before any shots were fired, you got up, went into the house, and closed the door; am I right about that?

16

A     Yes, sir.

Q     And only after that shots were fired?

A     Yes, sir.

Id. at 84. On re-direct, the prosecutor asked Williams, "And when the shots were being fired, were they being fired as you were running through the door?" Id. at 86. Williams responded, "You might as well say." Id. Additionally, Addison testified that he did not know that Williams was out on the porch because he was focused on the three individuals on the bicycles. Id. at 98.

During closing argument,[4] the prosecutor stated: "Well, what did Mr. Addison say? I saw some guy I don't know hand what appeared to be a gun to a short, light brown skinned black male, and then they started firing at Kelley Williams." Id. at 198. In summarizing Williams' testimony during closing argument, the prosecutor stated: "[Williams] told you, I don't want to be here. I have known that guy all of my life. I'm not happy to be here. He was like a brother to me, but he shot up my mama's house and he shot at me. I have to be here." Id. at 199.

---

[4] In Petitioner's state court petition alleging ineffective assistance of appellate counsel, he quoted alleged improper statements by the prosecutor in his opening statement, during witness examination, and during closing argument. See Resp. Ex. L at 3-6. In the instant Petition, however, Petitioner only argues that the prosecutor made alleged improper statements during closing argument. Doc. 1 at 7.

Initially, the Court notes that Petitioner's trial counsel did not object to the challenged statements during closing argument; thus, it is unclear if any challenge was preserved for review on direct appeal. Regardless, "[t]o find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1182 (11th Cir. 2010) (quotation and citation omitted). "If the misconduct fails to render the trial fundamentally unfair, habeas relief is not available." Id.

Considering the trial record as a whole, this Court finds that the alleged improper statements did not render Petitioner's trial fundamentally unfair. Therefore, appellate counsel was not deficient for failing to raise this issue on direct appeal. The record reflects that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, Petitioner is not entitled to federal habeas relief on this claim.

**C. Ground Three**

Petitioner claims that his trial counsel was ineffective "by failing to (a) object to improper jury instructions; (b) provide Petitioner with discovery; (c) improper conv[ey]ance of plea offer of 10 years; (d) cumulatively ineffective; [and] (e) misidentification of Petitioner." Doc. 1 at 8. Petitioner does not

elaborate on his arguments but notes that he raised each of these claims in his post-conviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850. Thus, the Court assumes Petitioner intends to raise the same ineffective assistance of counsel claims that he did in his Rule 3.850 proceeding and addresses each claim in turn.

### i.   Jury Instructions

In his Rule 3.850 motion, Petitioner argued that his trial counsel was ineffective for failing to object to the erroneous jury instructions read by the trial judge. Resp. Ex. H at 4-7, 20-23. Specifically, Petitioner argued that the trial judge improperly instructed the jury that the crime of shooting or throwing a deadly missile is a lesser included offense of attempted second degree murder. Id. at 5, 21. He further argued that "Judge Soud failed to instruct the jury on any 'necessary' lesser-included offenses and only instructed on the questionable 'permissive' lesser-included offense of shooting or throwing deadly missiles." Id. at 22.[5] According to Petitioner, this error precluded the jury from being "able to exercise its inherent pardon power." Id. at 23.

The postconviction court denied the claim:

> Defendant alleges counsel was ineffective for failing to object to a jury instruction for shooting or throwing a deadly missile, which Defendant claims is

---

[5] Notably, at the time of Petitioner's trial, there were no category one lesser-included offenses for attempted second degree murder. See Resp. Ex. H at 4, 21; see also Fla. Std. Jury Instr. (Crim) 6.4 (4th ed. 2002).

not a lesser included offense of attempted second degree murder. According to Defendant, the Court also failed to read any of the necessarily lesser included offenses. Defendant claims he was prejudiced, because these alleged failures interfered with the jury's "pardon power."

Two types of lesser included offenses exist under Florida law: necessary ("Category One") and permissive ("Category Two"). Wright v. State, 983 So. 2d 6, 8 (Fla. 1st DCA 2007). A Category One offense is an offense in which the statutory elements of the lesser included offense are necessarily included within those of the charged offense. Id. On the other hand, for an offense to be considered a Category Two offense, the indictment or information must allege all the statutory elements of the subject lesser offense and the evidence at trial must establish each of these elements. Id. at 9. Pursuant to section 790.19, Florida Statutes, a defendant is guilty of shooting or throwing a deadly missile if he or she wantonly or maliciously shoots or throws a deadly missile at, within, or into a public or private building that is either occupied or unoccupied.

The record reflects the information included all of the elements of shooting or throwing a deadly weapon. The record further reflects Defendant shot a firearm into the home of the victim because he was upset with the victim. Accordingly, both the charging document and evidence presented at trial supported an instruction for shooting or throwing a deadly missile. Therefore, counsel properly requested this offense as a lesser-included offense.

As to Defendant's claim trial counsel failed to request certain lesser-included offenses during deliberation over the jury instructions, the Defendant is relying on the possibility of the jury's "pardon power" to establish prejudice. However, the mere possibility that the jury could have found the

> Defendant guilty of a lesser included offense, had it been included, is not sufficient to support a finding of prejudice in an ineffective assistance of counsel claim. See Sanders v. State, 946 So. 2d 953, 959-60 (Fla. 2006) (holding that, although the failure to instruct the jury on a Category One offense can be per se reversible error on direct appeal, the mere possibility that jury might have exercised its pardon power cannot support an ineffective assistance of counsel claim in a postconviction motion). Accordingly, Defendant has failed to demonstrate[] prejudice. For the above stated reasons, Ground One is without merit.

Resp. Ex. H at 156-57 (internal record citations omitted). Petitioner appealed the denial of his Rule 3.850 motion, but when he failed to file an initial brief as directed, the First DCA dismissed his appeal. Resp. Ex. K. Because Petitioner did not fully exhaust this claim, the Court considers the claim on the merits.[6]

During the trial, the following discussion occurred outside the jury's presence:

> THE COURT: . . . [F]irst let me ask do you wish to have the lesser included of shooting, throwing deadly missile even though my understanding is it is not category 1 or 2?

---

[6] Respondents assert that Petitioner exhausted his ineffective assistance of trial counsel claims by presenting them in his Rule 3.850 proceeding. See Doc. 10 at 33. Because Petitioner failed to give the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," O'Sullivan, 526 U.S. at 845, he did not properly exhaust these claims. Nevertheless, the Court will proceed to address the claims on the merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

> [THE STATE]: It's not, Your Honor.
>
> THE COURT: Do you wish to have the lesser included of shooting or throwing a deadly missile added?
>
> [DEFENSE COUNSEL]: Judge, I just spoke with my client and [the state] about that. I'd like to wait until all of the evidence has been presented.

Resp. Ex. B at 157. At the close of all the evidence, the following occurred:

> THE COURT: . . . Mr. Blaisdell [(defense counsel)], let me ask you what is your client's preference on the lesser included of shooting or throwing a deadly missile?
>
> [DEFENSE COUNSEL]: Judge, we would like the version of the instruction that includes the lesser included.
>
> THE COURT: That includes?
> Does the state have any objection to that inclusion?
>
> [THE STATE]: No, sir. I believe even if I did, based on the facts presented before this Court, I think the Court would probably provide it anyway, so, no, sir.

Id. at 185-86.

In closing argument, Petitioner's counsel, while not conceding Petitioner's guilt, argued that the victim "got up, looked the shooter in the eye, and went into the house, . . . and then shots were fired. So if we're talking about this lesser-included offense, even if you believe [the victim's] testimony, I would submit to you that attempted murder has not been proven here." Id. at 220. He

continued, "[E]ven if you believe the state's evidence, the correct verdict would be the lesser included of firing a deadly missile into an occupied residence." <u>Id.</u>

The trial court then instructed the jury as agreed to by the parties. After reading the instructions on attempted second degree murder, the trial court stated:

> In considering the evidence, you should consider the possibility that although the evidence may not convince you that the defendant committed the main crime of which he is accused, there may be evidence that he committed other acts that would constitute a lesser-included crime. Therefore, if you decide that the main accusation has not been proven beyond a reasonable doubt, you will need to decide if the defendant is guilty of any lesser-included crime. The lesser crime indicated in the definition of attempted second-degree murder is shooting or throwing deadly missiles.

<u>Id.</u> at 233.

The record reveals that Petitioner's counsel's strategy was to convince the jury that Petitioner was not guilty, but if the jury believed the state's evidence, then at most, Petitioner was only guilty of "the lesser included" offense which carried a lower penalty. Nevertheless, the jury instructions on attempted second degree murder were proper and there was sufficient evidence to support the conviction. Indeed, the jury's verdict reflects their belief that the state proved beyond a reasonable doubt that Petitioner was guilty of attempted second degree murder. This Court presumes that the jury acted in accordance

with the law. See Strickland, 466 U.S. at 694. Consequently, the jury, following the trial court's instructions, would not have convicted Petitioner of any lesser included offense, even if the judge had given such instructions. See Sanders v. State, 946 So. 2d 953, 958 (Fla. 2006) (recognizing that in Florida, a jury may convict a defendant of a lesser included offense "only if it decides that the main accusation has not been proved beyond a reasonable doubt"); see also Strickland, 466 U.S. at 694-95 (noting in determining whether prejudice exists, a court should presume the "jury acted according to the law," and "[a]n assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed."); Magnotti v. Sec'y for Dep't of Corr., 222 F. App'x 934, 940 (11th Cir. 2007)[7] ("[A]ssuming without deciding that [the petitioner's] counsel was deficient in failing to request jury instructions on other lesser included offenses, that deficiency does not suggest that there was a reasonable probability that the outcome would have been different because the jury had sufficient evidence to find [the petitioner] guilty

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

of the greater offense."). Petitioner's argument to the contrary is based on pure speculation. Thus, even assuming counsel was deficient in the manner Petitioner suggests, Petitioner has not shown prejudice. Therefore, he is not entitled to federal habeas relief on this claim.[8]

### ii.    Discovery and Plea Offer

According to Petitioner, his trial counsel was ineffective for failing to review and provide him with copies of the discovery. Resp. Ex. H at 92. In his Rule 3.850 motion, Petitioner argued that trial counsel never discussed the discovery with him or the strengths and weaknesses of his case. Id. at 93. He claimed that had counsel done so, he would have accepted the state's 10-year plea deal. Id. at 93-94.

After conducting an evidentiary hearing on this issue, the postconviction court denied this claim:

> Defendant claims counsel was ineffective for failing to provide and review discovery with him. According to Defendant, this failure prevented him from participating in the formulation of his own defense. Furthermore, it inhibited him from understanding how strong or weak the State's case

---

[8] To the extent Petitioner argues that the trial judge erred by referring to "shooting or throwing a deadly missile" as a "lesser included offense" when it is not listed as a category one or two lesser included, such argument is of no moment. First, Petitioner did not exhaust this trial court error claim on direct appeal. Second, the trial judge clearly recognized it was not listed as a category one or two lesser-included offense and defense counsel, after consultation with Petitioner, requested the instruction be given. The state did not object to the instruction, noting that the evidence presented during the trial supported that instruction.

was against him, which, in turn, led him to reject a favorable plea deal. Defendant claims that but for counsel's failure to give and review discovery, he would have accepted the plea, the State would not have withdrawn it, the Court would have accepted it, and he would have received a reduced sentence.

In order to state a facially sufficient claim that an alleged deficient performance by counsel led to the defendant's non-acceptance of a plea offer, the Defendant must allege the following: "that (1) he or she would have accepted the offer had counsel advised the defendant correctly, (2) the prosecutor would not have withdrawn the offer, (3) the court would have accepted the offer, and (4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Alcorn v. State, 121 So. 3d 419,422 (Fla. 2013).

At the evidentiary hearing held on December 8, 2017, Defendant and his trial counsel, Christopher Blaisdell, Esq., testified. Defendant testified in conformance with his pleadings that counsel never discussed or reviewed discovery with him, but also testified counsel discussed speedy trial, DNA evidence, and an alibi with him. Notably, Defendant testified Mr. Blaisdell only visited him three times in jail from when he took over the case on August 3, 2010 until trial on July 7, 2011, which is corroborated by documents from the Jacksonville Sheriff Office ("JSO") concerning Defendant's movements and trial counsel's notes. Furthermore, the docket reflects during the time Mr. Blaisdell represented Defendant, they were present together in court eighteen times, but it is Defendant's contention they had limited discussion during those eighteen court dates because there was no separate holding cell in which to privately discuss the case. Defendant further testified he chose not to accept the ten-year plea deal because he had not reviewed discovery and the State had difficulty in

locating the victim and it was their hope the victim would not be present for trial. According to Defendant, he had no idea the victim had been found until he appeared on the stand the day of trial.

Mr. Blaisdell testified he did not have a specific recollection of a general discussion with Defendant about the facts of his case, but he did testify that it is his general practice and procedure to discuss with his defendants the facts of the case, discovery, relevant law, and the maximum sentence. However, Mr. Blaisdell did specifically remember discussing the availability of the victim in this case with Defendant. Indeed, Mr. Blaisdell's attorney notes from the case reflect discussions with Defendant concerning the victim's availability and speedy trial. Counsel further testified[] it was the practice at the Public Defender's Office to not supply a physical copy of the discovery to defendants unless it was absolutely necessary. The Public Defender instituted this policy because it feared portions of the discovery would go missing or be found by other inmates who would then try to use the discovery as a means to act as if they had inside information or insight and try to create deals with the prosecution as "informants."

Mr. Blaisdell testified he informed Defendant that the State had found the victim prior to trial, but Defendant still insisted on proceeding to trial rather than seek a continuance. Based on the State's inability to locate the victim, counsel and Defendant thought it prudent to invoke Defendant's speedy trial rights in hopes the victim would not show up for trial. Mr. Blaisdell testified he never told Defendant the victim would not appear for trial, but that it was reasonable to think he might not appear based on the State's inability to find the victim. According to Mr. Blaisdell, on the day prior to trial, July 6, 2011, he visited Defendant in jail, which is reflected in the JSO and attorney note documents, during which counsel testified he certainly would have discussed all facets of

27

the case with Defendant. In fact, Mr. Blaisdell stated Defendant explained his version of events to counsel and that they would have discussed the strength and weakness of that version in conjunction with the State's evidence.

Regarding the ten-year plea offer, Mr. Blaisdell testified he had no independent recollection of any plea offer from the State in this case, let alone a ten-year offer. Counsel noted nothing in his notes reflected any plea offer from the State, and he testified it was his habit and routine practice to memorialize in his notes any and all plea negotiations. Likewise, no transcript from any hearing date reflects a discussion of any plea offer. Notably, Mr. Blaisdell testified the prosecutor assigned to the case would not normally proffer plea deals to defense counsels; instead, he would state his openness to certain sentencing ranges but put the burden on a defendant or defense counsel to present a plea offer. However, counsel testified he did not recall Defendant ever requesting a plea offer be made to the State. Had Defendant requested an offer be made, Mr. Blaisdell stated he would have documented it, as per his general practice and routine.

According to Mr. Blaisdell, from the beginning of their discussions, Defendant was as close to certain as possible the victim would not show up for trial, which meant there was no need for him to offer or accept any plea. Defendant and the victim were friends, almost like brothers, according to the victim's testimony at trial and Defendant's statements to counsel pre-trial, despite Defendant's testimony at trial and at the evidentiary hearing that they were not close. This friendship is what fueled Defendant's belief that if he went to trial, the victim would not appear and it was this mental calculus that led Defendant to decline making a plea offer according to counsel.

Notably, at the evidentiary hearing, the State introduced as its Exhibit Six a transcript from a

28

hearing held on July 5, 2011, which reflects Defendant was present in open court with his attorney when a discussion occurred concerning the State locating and securing the victim's presence for the trial. At that hearing, Defendant also stated he had discussed the victim's availability and whether to move for a continuance with his counsel. However, in his Motions and at the evidentiary hearing, Defendant denied knowing of the victim's availability until the moment the victim testified. The record refutes this contention and demonstrates Defendant's unreliability as a witness.

Although Mr. Blaisdell's memory of the case has faded with time, his testimony of his habit and routine "creates an inference which can be considered by the trier of fact without corroborative evidence." State v. Avila, 43 So. 3d 936, 938 (Fla. 3d DCA 2010). Having had an opportunity to view the demeanor of the witnesses and compare it to the record as well as the testimony and evidence presented at the hearing, the Court finds Mr. Blaisdell's testimony to be credible and find[s] the inference of his general practice and routine to be credible in the instant case. While the Court does not condone the limited amount of visitation Mr. Blaisdell had with his client, the Court finds it does not rise to the level of deficiency contemplated by Strickland for at least two reasons.

First, the decision not to supply hard copies of discovery was reasonable given the policies of the Public Defender and, although limited in the amount of times they met, the Court is convinced Mr. Blaisdell did discuss the discovery as well as the strengths and weaknesses of the case as outlined in his testimony. Second, the Court finds the State never offered Defendant a ten-year plea deal, or any plea deal for that matter. Therefore, as no plea deal existed, Defendant's claim of prejudice is without merit as the entirety of his prejudice claim revolves around his willingness to accept the plea had counsel properly

> discussed the case with him prior to trial. For these reasons, Defendant is not entitled to relief on Ground Two.

Resp. Ex. H at 157-62. Petitioner appealed the denial of his Rule 3.850 motion, but when he failed to file an initial brief as directed, the First DCA dismissed his appeal. Resp. Ex. K. Because Petitioner did not fully exhaust this claim, the Court considers the claim on the merits.

The state postconviction court credited the testimony of Petitioner's trial counsel and specifically found Petitioner was an unreliable witness. Absent clear and convincing evidence to the contrary, the postconviction court's factual findings are entitled to a presumption of correctness. See Bishop, 726 F.3d at 1258 (citing 28 U.S.C. § 2254(e)(1)). Petitioner has not presented any evidence to rebut this presumption, thus this Court has "no power on federal habeas review to revisit the state court's credibility determinations." Id. at 1259.

The record supports the denial of this claim as Petitioner has failed to show his counsel was deficient for not providing him hard copies of discovery. Additionally, trial counsel testified that he would have reviewed with Petitioner the discovery and the strengths and weaknesses of Petitioner's case prior to going to trial, and the postconviction court credited counsel's testimony. Finally, there is no indication that a plea offer was ever made. A thorough review of the record shows this ineffectiveness claim has no merit and is due to be denied.

### iii.   Misidentification of Petitioner

In his Rule 3.850 proceeding, Petitioner argued that his trial counsel was "ineffective for failing to adequately challenge and form a viable affirmative defense to the misidentification of [Petitioner] by witness Quillian Addison and the alleged victim Kelley Williams." Resp. Ex. H at 33 (capitalization omitted). The state postconviction court denied the claim:

> Defendant alleges his counsel was ineffective for failing to adequately challenge and form a viable affirmative defense to the alleged misidentification of Defendant as the suspect by Quillian Addison. Defendant claims Mr. Addison told police he saw a brown-skinned African-American male with dreadlocks, but Defendant alleges he is a light-skinned African-American who never wore dreadlocks. Counsel, Defendant argues, should have impeached Mr. Addison with this statement to police. Moreover, Defendant contends counsel should have moved to suppress Mr. Addison's statements, because Mr. Addison did not have sufficient information to identify Defendant.

> Defendant also claims his counsel was ineffective for not adequately challenging the identification made by the victim, Kelley Williams. First, Defendant states counsel failed to depose Mr. Williams, which resulted in a lack of prior statements to possibly impeach Mr. Williams. Second, Defendant alleges counsel failed to go to the apartment complex where the incident occurred to search for eyewitnesses. Third, Defendant claims that at trial counsel should have highlighted the fact that Mr. Williams never saw Defendant actually fire the weapon because Mr. Williams was running inside the house.

Concerning Mr. Addison, the record reflects he was not wearing his glasses at the time of the incident and did not identify Defendant as the suspect because of how quickly everything occurred. However, Mr. Addison remembered the shooter was a short African-American male with brown skin and a light complexion. As Mr. Addison did not identify Defendant as the shooter, there would have been no basis to file a motion to suppress his identification of Defendant as the shooter. Furthermore, Mr. Addison's trial testimony was consistent with his statement to police regarding Defendant's complexion. Counsel cannot be deemed ineffective for failing to raise a meritless argument. Hitchcock v. State, 991 So. 2d 337, 361 (Fla. 2008). Furthermore, based on Mr. Williams own identification testimony, Defendant cannot demonstrate prejudice.

To the extent Defendant argues counsel was ineffective for failing to depose Mr. Williams to uncover potential inconsistencies or go to the apartment complex to search for eyewitnesses, Defendant's claims are entirely speculative. Defendant relies on the possibility Mr. Williams may have made inconsistent statements had he been deposed, but there is no certainty Mr. Williams would have made inconsistent statements about material facts. Likewise, to the extent Defendant argues counsel should have searched for my [sic] eyewitnesses, it is speculative to think an eyewitness would come forward that the police investigation missed and that this unknown eyewitness would have corroborated Defendant's story. Postconviction relief cannot be based on speculation or possibility. Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000). Accordingly, Defendant is not entitled to relief on this claim.

Regarding Defendant[']s claims of ineffectiveness as it relates to failing to highlight Mr. Williams never seeing the actual shooting, the record demonstrates no deficiency or prejudice. The record

specifically reflects during cross-examination, counsel asked Mr. Williams whether he saw shots fired from Defendant's gun, with Mr. Williams responding he never saw Defendant actually shoot. Counsel raised this fact during his closing argument as well. Accordingly, the record demonstrates counsel did highlight this fact for the jury during cross-examination and closing argument.

Moreover, Mr. Williams testified he was a friend of Defendant, a fact Defendant conceded at trial also. Mr. Williams further testified Defendant raised a gun as if to shoot it, at which point Mr. Williams fled into his home hearing three gun shots and glass shattering around him. It is a reasonable inference from these facts alone that Defendant, a man Mr. Williams was intimately familiar with, fired the shots. However, there was more evidence identifying Defendant as the shooter in the form of an eyewitness, Mr. Addison, who corroborated the shooting, although not Defendant's identity. Accordingly, highlighting the fact Mr. Williams never actually saw Defendant shoot would not and did not have a reasonable probability of affecting the outcome of the trial. For the above stated reasons, Defendant cannot demonstrate deficient performance or prejudice and is not entitled to relief on Ground Five.

Resp. Ex. H at 163-66 (internal record citations omitted). Petitioner appealed the denial of his Rule 3.850 motion, but when he failed to file an initial brief as directed, the First DCA dismissed his appeal. Resp. Ex. K. Because Petitioner did not fully exhaust this claim, the Court considers the claim on the merits.

Upon review of the record, the Court finds that Petitioner has shown neither deficient performance nor resulting prejudice. During his trial testimony, Addison provided a physical description of the shooter, and advised

that Williams told him within minutes of the shooting that "Donmonique" was the shooter. Addison did not specifically identify Petitioner to the police; as such, there was nothing to suppress prior to trial. Additionally, Petitioner's claims that counsel was ineffective for failing to depose Williams or search for other eyewitnesses are based wholly on speculation. Therefore, Petitioner is not entitled to federal habeas relief on this ground.

### iv.   Cumulative Effect

In his Rule 3.850 proceeding, Petitioner argued that the cumulative impact of his counsel's deficiencies violated his Sixth Amendment right to the effective assistance of counsel and caused him to reject the state's 10-year plea offer.

After conducting an evidentiary hearing on this ground, the state postconviction court denied the claim:

> Defendant contends the cumulative errors of his counsel prejudiced him, while also arguing counsel failed to inform him of the strengths and weaknesses of his case and the maximum penalty he faced. The latter failure allegedly prejudiced Defendant because he rejected a favorable plea deal.
>
> At the evidentiary hearing, Defendant testified he had researched on his own that his maximum exposure was fifteen years for a second degree felony, but this turned out to be wrong as he was actually subject to a maximum sentence of thirty years in prison due to the 10-20-Life statu[t]e. According to Defendant, he asked his attorney what his maximum exposure would be, but counsel never answered his

34

question. Conversely, his attorney testified accurately about the 10-20-Life statu[t]e and how it enhances a second degree felony to a first degree felony and requires the imposition of a minimum mandatory sentence. He further testified he absolutely would have discussed the implications of this law on Defendant's maximum sentence, as was his general practice and procedure. As stated above in the Court's analysis of Ground Two, Mr. Blaisdell had no recollection of a plea offer being made. Moreover, it would have been his practice to document any plea offer in his notes, and his notes, introduced at the hearing, did not reflect any such offer.

Having had an opportunity to observe the demeanor of the witnesses in conjunction with the record evidence, the Court finds the testimony of Mr. Blaisdell to be credible. The Court finds Mr. Blaisdell correctly instructed Defendant on the maximum exposure of his sentence as well as the strengths and weaknesses of his case; therefore, Defendant has failed to prove deficient performance. Furthermore, the Court finds no plea was offered to Defendant. Accordingly, as no plea offer existed, Defendant has failed to prove prejudice.

To the extent Defendant alleges cumulative error, where all individual claims are denied as procedurally barred or without merit, the claim of cumulative error is also without merit. Griffin v. State, 866 So.2d 1, 22 (Fla. 2003). All claims in the instant Motions have been denied on the merits; therefore, Defendant's claim of cumulative error is likewise without merit. Accordingly, Defendant is not entitled to relief on Ground Three.

Resp. Ex. H at 162-63. Petitioner appealed the denial of his Rule 3.850 motion, but when he failed to file an initial brief as directed, the First DCA dismissed

his appeal. Resp. Ex. K. Because Petitioner did not fully exhaust this claim, the Court considers the claim on the merits

None of Petitioner's individual claims warrant relief; thus, there is nothing to accumulate. See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). Counsel's alleged errors, neither individually nor cumulatively, deprived Petitioner of a fair trial or due process. Accordingly, this claim is due to be denied.

### D. Ground Four

Petitioner argues that the trial court erred in excluding evidence showing the victim's bias and trial counsel was ineffective for failing to impeach the victim with his bias. Doc. 1 at 10. He notes that "[t]he facts to support these arguments are stated in Petitioner's initial brief on Direct Appeal and are incorporated by reference hereto." Id.

Immediately before the trial began, the state informed the trial court that it had received an email the night before from Petitioner's counsel with a two-page attachment. See Resp. Ex. B at 6. The first page was a reasonable efforts affidavit and the second page was one page of a court order. See Resp. Ex. A at 44-45.[9] The documents were "addressing some type of investigation" that occurred after the October 5, 2009 shooting, concerning allegations of sexual

---

[9] The documents appear to be part of a child protective services investigation and court order regarding the custody of Ms. Middleton's children.

36

molestation and lewd and lascivious conduct by Williams against Petitioner's minor daughter. Resp. Ex. B at 6-7. The state argued that these documents were inadmissible because they were irrelevant and prejudicial. Id. at 7. Petitioner's counsel agreed that the documents did not "appear to be relevant to anything" at that point in time but insinuated that they may become relevant based on how the testimony unfolds. Id. at 9. The trial court prohibited any reference to the subject matter raised in the documents but instructed defense counsel to approach at side bar if he believed that the door had been opened during the trial. Id.

Petitioner, through appellate counsel, raised these issues on direct appeal. See Resp. Ex. D. Petitioner summarized his arguments as follows:

> The court committed fundamental error when it excluded evidence that the main witness against the Defendant, and the only witness who identified him as the shooter, was involved in a case of alleged abuse, including sexual abuse, in which the Defendant's child, and another child bearing the Defendant's name, were the victims. The court (and the parties) incorrectly focused on the lack of connection between the alleged child abuse and the alleged shooting for which the Defendant was on trial. However, the evidence properly related to the bias of the witness and should have been allowed for impeachment purposes.

> Furthermore, trial counsel was ineffective in allowing the witness's bias to go unchallenged. The defense conceded that the evidence was not relevant to the charges, but did not argue that it could be used to impeach Mr. Williams, and made no effort to impeach him at the time he testified. The result was that Mr.

Williams was able to paint a picture of a life-long friendship making him reluctant to testify against the Defendant. The jury might have heard that testimony very differently if they knew that Mr. Williams not only was romantically involved with the mother of Mr. Cockrum's child, but also was suspected of committing child abuse that resulted in Mr. Cockrum's child being placed in foster care. His reluctance to come into court might have been seen in a different light if the jury knew that the only reason he was not being charged with child abuse was that a Georgia agency could not determine where the abuse took place.

Finally, Mr. Cockrum's denial that he and Mr. Williams were "like brothers" was portrayed as evidence of his lack of credibility. The jury might have seen this in a very different light, as well, if the jury knew that, by the time Mr. Cockrum testified, he had learned about the abuse allegations. Because Mr. Williams was the only person who identified Mr. Cockrum as the shooter, and because there was no physical evidence linking Mr. Cockrum to the scene, the entire case hinged on witness credibility. There could have been no strategic reason to fail to impeach Mr. Williams with evidence that he had other, strong reasons not to want to come into court, and that his relationship with Mr. Cockrum might not be as close as he was portraying it to the jury.

Id. at 13-14.

The state filed an answer brief arguing that the trial court error claim was not preserved or properly argued on appeal but alternatively addressed the claim on the merits. See Resp. Ex. E at 8-14. Notably, the state argued that the trial court properly excluded the "unrelated, post-arrest charges" because they

were not relevant. Id. at 14. The state also addressed Petitioner's ineffective assistance of counsel claim on the merits. See id. at 15-23.

Petitioner filed a counseled reply brief reiterating that the trial court committed fundamental error by excluding compelling evidence of the victim's bias. See Resp. Ex. F. The First DCA per curiam affirmed Petitioner's conviction and sentence without issuing a written opinion. See Resp. Ex. G.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. The Court notes that "[a]s a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]" Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir. 1994); see also Baxter v. Thomas, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court unless rulings deny petitioner fundamental constitutional protections). Thus,

Petitioner's underlying challenge to the state's court's determination on the admissibility of the subject evidence is not generally proper for this Court's consideration. As to Petitioner's ineffectiveness claim, the Court finds that the record supports the state court's determination. Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

Accordingly, it is

**ORDERED**:

1.      The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[10]

---

[10] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

3.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 12th day of August, 2022.



TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 8/2
c:
Donmonique Cockrum, #J45081
Counsel of Record